## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANTS

Megan B. Quirk
Muncie, Indiana

Kristin R. Willadsen
Muncie, Indiana

ATTORNEY FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of C.W., Minor Child, and his parents,

B.S. and Ch.W.,

*Appellants-Respondents*,

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

July 6, 2015

Court of Appeals Case No. 18A02-1501-JT-163

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

The Honorable Brian M. Pierce, Magistrate

Case No. 18C02-1404-JT-21

**Vaidik, Chief Judge.**

# Case Summary

[1]  B.S. ("Mother") and Ch.W. ("Father") appeal the termination of their parental rights to their son, C.W. They argue that there is insufficient evidence to support the trial court's termination order. Mother also argues that termination of her parental rights is not in C.W.'s best interests. But neither parent has proven that they are capable of caring for their child: Mother failed to complete court-ordered services and did not remedy authorities' concerns about her substance abuse, employment, education, and housing, and Father, who has ongoing substance-abuse issues, is serving an eight-year sentence for a felony drug conviction. C.W., meanwhile, is thriving in the care of his maternal grandmother, who hopes to adopt him. We conclude that there is sufficient evidence to support the termination order and that termination is in C.W.'s best interests. We affirm.

# Facts and Procedural History

[2]  Mother and Father's child, C.W., was born in March 2012. In June 2013 the Indiana Department of Child Services (DCS) learned that C.W. was living in a home where methamphetamine was being manufactured. DCS removed C.W. from his parents' care and filed a petition alleging that he was a child in need of services (CHINS). C.W. was later placed with his maternal grandmother.

[3]  DCS's CHINS petition alleged that:

- C.W., Mother, and Father were present in a home where methamphetamine was produced and used

- Father used illegal drugs, including methamphetamine

- Mother used illegal drugs, including marijuana

- C.W., at fifteen months old, had not received routine medical care and was not current on his vaccinations

- Marijuana was found near C.W.'s toys in the home

*See* State's Ex. 2. A short time later, Father was arrested and charged with Class B felony dealing in methamphetamine, Class C felony neglect of a dependent, Class D felony possession of methamphetamine, and Class D felony possession of chemical reagents or precursors with intent to manufacture.

[4] Mother and Father admitted that C.W. was a CHINS. In October 2013 the trial court ordered Mother and Father to do a variety of things to facilitate reunification with C.W., including: exercise routine parenting time with C.W., refrain from using illegal drugs, participate in random drug testing, maintain appropriate housing, and complete parenting and substance-abuse assessments. Mother was also ordered to complete her GED. *See* State's Ex. 10.

[5] Father, who was on home detention awaiting trial, exercised parenting time with C.W. for two months until he violated the terms of his home detention by manufacturing methamphetamine. Father later pled guilty to Class B felony dealing in methamphetamine and began serving an eight-year sentence. Mother, meanwhile, did not participate meaningfully in any court-ordered services. In April 2014 DCS filed a petition to terminate Mother's and Father's

parental rights. The trial court held a hearing on the termination petition in October 2014.

[6] At the hearing, caseworkers testified that Mother made no real progress toward reunification. Mother's therapist, Aaron Mocherman, testified that Mother struggled with substance abuse and was "not in recovery." Tr. p. 24. Mocherman explained that "there's stated sobriety . . . but there's not the rearrangement in the rest of [her] life. Changing social networks, dealing with conflicts in healthy ways that facilitate recovery. Um, lack of twelve-step meeting attendance. Those things." *Id.* at 25. Jennifer Lombard, Mother's home-based service provider, testified that she worked with Mother in three areas: employment, education, and housing. Mother made no progress in these areas—she found a job as a hostess at Bob Evans, but her employment lasted only one week. *Id.* at 33-34. And Mother, who dropped out of high school, had not made any progress toward completing her GED, nor had she secured suitable housing. *Id.* at 34. Family Case Manager Amy Swingley (FCM Swingley) echoed Lombard's and Mocherman's testimony. She also testified that of eleven random drug screens, Mother refused four screens and tested positive for marijuana and cocaine twice. *Id.* at 43.

[7] FCM Swingley also testified about Father's lack of progress. Before Father's home detention was revoked, he exercised parenting time with C.W. but failed to complete a required substance-abuse assessment and tested positive for methamphetamine, amphetamine, cocaine, and marijuana. *Id.* at 39. FCM

Swingley said that she did not believe that the conditions that led to C.W.'s removal would be remedied due to:

> [Father]'s current incarceration.  He had been released from jail and was given the opportunity to comply [with] services and he failed to stay out of jail.  He did not follow through with his substance-abuse assessment while he was released and at this time [M]other has not made any progress in services and doesn't maintain regular visitation with her child.

*Id.* at 44.  She further opined that Mother and Father were "currently incapable of caring for [C.W.] and maintaining his safety."  *Id.* at 44-45.  C.W., who was still in his maternal grandmother's care, was "thriving and doing very well.  He has an excellent daycare where they report he is progressing in his speech.  Um, he . . . [is] on time in his developmental milestones."  *Id.* at 45.  Maternal grandmother hoped to adopt C.W.  *Id.*  C.W.'s court-appointed special advocate testified that C.W. deserved permanency, "and the best way for that to happen is for him to be adopted by his grandmother."  *Id.* at 81.

[8] Mother and Father both testified.  They acknowledged that they had not complied with the trial court's orders, but nonetheless opposed termination of their parental rights.

[9] In December 2014 the trial court entered an order with findings terminating Mother's and Father's parental rights.  Appellant's App. p. 63-66.  In its order, the court emphasized both parents' lack of progress:

> [In] . . . October [] 2013, Father . . . was granted pretrial electronic home detention in his pending criminal case, thereby opening up an opportunity for Father to start regularly visiting with his child. By all

accounts, the supervised visitation between the child and Father went well as Father showed the capacity to be a loving and caring parent. However . . . a petition to revoke [Father's] pretrial home detention was filed. [Father] violated the terms of his pretrial release and was again incarcerated pending the outcome of his outstanding criminal charges. By violating the terms of his pretrial release, [Father] once again succumbed to the pull of his substance abuse and sacrificed his relationship with his son in the process.

*     *     *     *     *

[Father's] pattern of illegal drug use, criminal activity, and current incarceration indicates that he is incapable at this time of providing the safe, stable, and permanent parenting that the child needs and deserves.

[Mother] demonstrated no progress in her reunification services, despite being given every opportunity to do so. She has not, in any meaningful manner, addressed her substance abuse, her substandard parenting skills, her educational deficiencies, her lack of employment, and her lack of housing.

*Id.* at 63-64 (formatting altered).

Mother and Father now appeal.

# Discussion and Decision

Mother and Father, appealing separately, both argue that there is insufficient evidence to support the trial court's order terminating their parental rights. Mother also argues that termination is not in C.W.'s best interests.

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citations omitted). The parent-child relationship is one of our culture's most valued relationships. *Id.* (citation

omitted). "And a parent's interest in the upbringing of their child is 'perhaps the oldest of the fundamental liberty interests recognized by the courts.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). But parental rights are not absolute—"children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id.* (citations omitted). Thus, a parent's interests must be subordinated to a child's interests when considering a termination petition. *Id.* (citation omitted). A parent's rights may be terminated if the parent is unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs. *Id.* (citations omitted).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1229 (citation omitted). Instead, we consider only the evidence and reasonable inferences that support the judgment. *Id.* (citation omitted). "Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous." *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* (citation omitted).

A petition to terminate parental rights must allege:

(A) that one (1) of the following is true:

    (i)      The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii)     A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

    (iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i)      There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[4] "DCS must prove the alleged circumstances by clear and convincing evidence." *K.T.K.*, 989 N.E.2d at 1231 (citation omitted). On appeal, both parents challenge the sufficiency of the evidence supporting the trial court's judgment as to subsection (B) of the termination statute. Mother also argues that termination is not in C.W.'s best interests.

# 1. Conditions Remedied

[5] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS was required to establish, by clear and convincing evidence, only one of the three requirements of subsection (B). We therefore need only discuss whether there is a reasonable probability that the conditions that resulted in C.W.'s removal or the reasons for his placement outside his parents' home will not be remedied.

[6] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* (quotation omitted). The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against "habitual patterns of conduct to determine

whether there is a substantial probability of future neglect or deprivation." *Id.* (citations omitted).

[7] Here, the trial court concluded that there was a reasonable probability that the conditions resulting in C.W.'s removal from Mother's and Father's care or placement outside their home would not be remedied. In reaching this conclusion, the court explained that neither parent had made any progress in improving their ability to parent C.W.:

> [Father's] pattern of illegal drug use, criminal activity, and current incarceration indicates that he is incapable at this time of providing the safe, stable, and permanent parenting that the child needs and deserves.
>
> [Mother] demonstrated no progress in her reunification services, despite being given every opportunity to do so. She has not, in any meaningful manner, addressed her substance abuse, her substandard parenting skills, her educational deficiencies, her lack of employment, and her lack of housing.

Appellant's App. p. 64.

[8] Despite this, Mother argues that "there is no evidence in the record that . . . [Mother] ever abused her child and little evidence that she neglected her child in any way." Appellant Mother's Br. p. 15. Mother's argument is not persuasive—she fails to acknowledge her lack of participation in court-ordered services as well as caseworkers' legitimate and ongoing concerns about her substance abuse, employment, education, and housing issues. There is sufficient evidence to support the trial court's decision to terminate Mother's rights.

[9] Likewise, there is sufficient evidence to support the court's decision to terminate Father's rights. During these proceedings, Father pled guilty to Class B felony dealing in methamphetamine and began serving an eight-year sentence. At the termination hearing, FCM Swingley testified that before Father's home detention was revoked, he failed to complete a required substance-abuse assessment and tested positive for methamphetamine, amphetamine, cocaine, and marijuana, and at the time of the termination hearing, Father was not scheduled to be released for nearly two years. On appeal, Father argues that C.W. does not have extraordinary needs and Father has family support. *See* Appellant Father's Br. p. 17. He also argues that he took responsibility for his substance abuse but was unable to take advantage of inpatient substance-abuse programs due to his incarceration. *Id.* But as the trial court emphasized—and Father himself admits—Father has a well-documented history of substance abuse that he has not remedied, and he has been unavailable to parent C.W. for most of his young son's life due to his criminal conduct. In light of this, we cannot say the trial court erred in terminating Father's parental rights. *See Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006) (holding that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children."), *trans. denied.*

## 2. Best Interests

[10] Mother argues that termination is not in C.W.'s best interests. In determining what is in a child's best interests, the trial court must look to the totality of the

evidence. *See A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied.* "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*

[11] As we have already explained, Mother failed to participate in court-ordered services and, as a result, failed to alleviate legitimate and ongoing concerns about her substance abuse, employment, education, and housing. She also failed to exercise regular parenting time with C.W. At the termination hearing, FCM Swingley told the trial court that Mother was "currently incapable of caring for [C.W.] and maintaining his safety." Tr. p. 44-45. C.W., meanwhile, was thriving in his maternal grandmother's care, and she hoped to adopt him. C.W.'s court-appointed special advocate testified that C.W. deserved permanency, "and the best way for that to happen is for him to be adopted by his grandmother." *Id.* at 81.

[12] We conclude that the evidence supports the trial court's determination that termination of Mother's parental rights is in C.W.'s best interests. *See In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of caseworkers, together with evidence that the conditions resulting in placement outside the home will not be remedied, was sufficient to prove by clear and convincing evidence that termination was in child's best interests), *trans. denied*; *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to

force them to wait while determining if their parents will be able to parent them).

[13] Affirmed.

Kirsch, J., and Bradford, J., concur.